JOHN MECKES & SONS CO., APPELLEE, *v.* AMERICAN MEAT CO., APPELLANT. (TWO cases.)

(Nos. 22906 and 22910—Decided February 10, 1954.)

*Mr. S. J. Blair,* for appellee.
*Messrs. Spieth, Spring & Bell,* for appellant.

HURD, P. J. In this action, we have before us for review two separate appeals on questions of law from a judgment of the Court of Common Pleas of Cuyahoga County. For purposes of brevity, the parties will be designated as plaintiff and defendant, respectively, as they appeared in the trial court.

Plaintiff filed its petition for money only in the sum of $16,275.92, plus interest, alleged to be due as rent under a written lease covering three floors of a commercial building located at West 25th street and Carroll avenue in Cleveland.

The defendant filed an answer which, by leave of court, was denominated ''Answer and Cross-Petition'' wherein it denied that it was indebted to plaintiff in any sum whatsoever and claimed that the rental to plaintiff was by agreement of plaintiff abated during the period for which suit was brought commencing December 8, 1948, through October 28, 1949, and further claimed the right under a contractual provision of the lease to deduct from rentals claimed by plaintiff, the cost of repairs and improvements made by it to the leased premises.

Plaintiff in an amended reply admitted the provisions of the lease and its obligation to make certain repairs as provided therein, but by way of affirmative defense, alleged, in substance (1) that the defendant had prevented plaintiff from making the promised repairs whereby plaintiff was excused from its obligation to do so and (2) that the defendant had demanded the making of the repairs, not for its own enjoyment and convenience, but only for the purpose of coercing plaintiff into granting an extension of defendant's lease, and by reason thereof had not made the demand for the repairs to the premises in good faith.

Trial by jury was waived and after a full hearing and consideration of briefs, the trial court rendered judgment in favor of plaintiff in the sum of $5,541.69 and costs.

From this judgment both parties filed separate appeals, defendant in appeal No. 22906, contending that the trial court erred in giving effect to an intention of the contracting parties not expressed in their written agreement and that the plaintiff was not entitled to

recover in any amount whatsoever because the cost of repairs to plaintiff's building equalled and even exceeded the amount of rentals claimed by plaintiff by reason whereof rent was abated to the extent of such cost and, therefore, that judgment should have been rendered for the defendant and, plaintiff in appeal No. 22910, contending that the trial court erred in not awarding judgment for the full amount prayed for in its petition.

The trial court, upon request, made separate findings of fact and conclusions of law, the conclusions of law setting forth, *inter alia*, that against the amount of $16,275.92, otherwise due plaintiff as rentals, defendant was entitled to a credit of $11,619.02 expended for repairs, leaving a balance of $4,656.90 unpaid and owing from defendant to plaintiff as of October 29, 1949, which, with interest at 6 per cent from that date to date of judgment in the amount of $884.70, made a total sum of $5,541.60, for which the judgment was rendered as above indicated.

The essential findings of fact of the trial court may be briefly summarized as follows:

On October 20, 1949, and for several years prior thereto, plaintiff was lessor and defendant was lessee of three floors of the commercial building hereinbefore described. The leases, which were entered into on or about May 28, 1937, and by the terms of which were to expire on September 7, 1950, were in writing and admitted in evidence. Joint exhibit 4 and exhibit A attached thereto and made a part thereof, made provision for repairs during the term of the lease in the following language:

"The lessor agrees to put the passenger and freight elevators in said building in good working condition and in compliance with the ordinances of the city of Cleveland and the laws of the state of Ohio and to secure certificates permitting their operation from the

Commissioner of Buildings of the City of Cleveland and further agrees to make the repairs specified in the paper writing marked "exhibit A" and attached hereto and made a part hereof as if fully rewritten herein and agrees that it will commence said repairs within fifteen (15) days after receipt from the lessee of written demand so to do and will complete said repairs within sixty (60) days after receipt of such written demand, and further agrees that if said repairs are not begun within such fifteen day period lessee may make such repairs, or, if commenced and not finished within the period hereinbefore specified, may complete the same and deduct the cost thereof from the rentals payable hereunder and under the other three leases hereinbefore mentioned, and the lessor further agrees that all such rentals shall be abated for the period that such repairs shall remain uncompleted after the expiration of sixty (60) days after the receipt of said written demand, except that if the commencement or completion of said repairs by the lessor will be delayed by war, fire, strikes, flood, accident or any other cause interfering with the procurement of labor or materials for such repairs, the times limited for such commencement or completion will be extended by the period of such delay and the rent will not be abated during such period."

Exhibit "A," attached to the lease, is a photostatic copy of a scale drawing prepared by one Milo Seymour Holdstein, registered architect No. 1072, itemizing and setting forth the detail of the repairs which the lessor agreed to make upon demand. Repairs were to be made to the second and third floors of the building and consisted among other things of the following:

"The installation of new toilets for men and women with instantaneous hot water heaters and mastic floors; removing rotted plaster under sills and replastering; caulking under all sills and replacing all rotted sills,

sash or trim around building; the making of a new office by removing stairs and installing flooring, plaster, trim, etc.; patching all rotted and missing flooring and column bases, removing all radiators and adjacent pipes, and sanding and filling the entire floor; painting all walls, ceiling, columns and trim with three coats of first grade lead and oil paint; removing all wood moulding and replacing with flat wire mould, installing globes in outlets with all fixtures hanging from the ceiling at equal distances; replacing broken glass throughout; installing new maple flooring in a certain area; repairing stairs to the lower floor with risers and new maple treads and a rail and newel; enclosing stairs; putting two elevators in first class working order; closing stairs and installing a floor over the opening.''

The rental for the premises was paid by the lessee up to and including December 7, 1948. From December 8, 1948, to October 20, 1949, inclusive, the lessee occupied the premises but did not pay any rent. The period following October 20, 1949, is not involved in the suit.

The lessee first made demand of the lessor by letter to make repairs on August 24, 1946. Thereafter, the lessor did send one man to the premises. The work, however, could not be done because of war restrictions. On October 30, 1948, after war restrictions had been released, the lessee again made written demand upon the lessor. Fifteen days having elapsed thereafter, during which no repairs were made. the lessee, on November 20, 1948, advised the lessor of lessee's intention to make the repairs. On November 22, 1948, the lessor denied any obligation to make repairs and advised the lessee that any steps in that direction would be at lessee's own risk and expense. The lessee then discontinued paying the rent after December 7, 1948, and on December 15, 1948, entered into an agreement with

The J. H. Dickson Company to make repairs on a cost plus 20 per cent basis, the performance by Dickson either in material or labor not to be in excess of $1,800 per contract month. Under this contract, the J. H. Dickson Company did work in the area specified in exhibit A, for the next 11 months, for which the defendant paid the total sum of $17,428.50.

It clearly appears from the findings of fact and the judgment, that the issues of fact raised as affirmative defenses by plaintiff in its amended reply traversing the allegations of defendant in its answer and cross-petition, were determined by the trial court in favor of the defendant and against the plaintiff, the court stating in part as follows:

"It is *contended* by the *plaintiff* that the *defendant acted in bad faith by preventing the plaintiff from making repairs, but these claims of the plaintiff the court does not find substantiated by the evidence. The court does find* that after receipt of demand for repairs on October 30, 1948 after restrictions had been lifted, *that the plaintiff failed to make repairs and that therefore the defendant had a right to make such repairs* as were within the limitations provided for in the lease and to deduct the cost thereof from rents due." (Emphasis supplied.)

However, upon the legal question of interpretation of the rights and liabilities of the parties as defined by the provision of the lease relating to repairs the trial court stated in its conclusions of law in part "the court finds that the contract *must be so construed as to provide that the defendant was limited to such repairs as could, without restrictions, be completed within sixty days.*" (Emphasis supplied.)

The trial court then set forth further in its conclusions of law the following:

"Wherefore, the court reaches the conclusion that defendant *should be allowed to offset against the rent*

*due to the plaintiff that amount expended for repairs
which could have been completed within the sixty day
period which would be two-thirds of the total amount
expended for repairs, requiring ninety days to complete* without restriction." (Emphasis supplied.)

It was upon this process of reasoning and construction of the contract that the court found that the defendant was entitled to a credit of only $11,619.02 out of a total expenditure of $17,428.50. Thus, it appears that the trial court by construction placed a limitation upon the asserted right of the defendant to deduct the full cost of the repairs described in exhibit "A," attached to and made part of the lease. Inasmuch as the contractual provision of the lease does not, by the language employed, contain such a limitation, two questions of law are presented; first, is the agreement so ambiguous and uncertain in its terms and provisions as to require judicial construction, and, second, did the trial court err in its conclusion that plaintiff was limited by the agreement to an offset of only two-thirds of the total sum expended for repairs?

In the review, we must bear in mind that the action is for money only, and that this appeal is before this court on questions of law only. Consequently, where there are disputed questions of fact, this court can not proceed to weigh the evidence and reach an independent judgment as to the facts as on a trial *de novo.* That is solely the function of the trial court. As heretofore stated, the trial court found that the affirmative defenses asserted by plaintiff in its amended reply to defendant's cross-petition to the effect that defendant acted in bad faith by preventing plaintiff from making the repairs was not substantiated by the evidence and that the conduct of defendant was not such as to excuse the plaintiff from making the repairs.

The majority of this court, upon a careful consideration of the entire record, is very definitely of the opin-

ion that the evidence amply supports these findings. Therefore, we cannot say that the findings of fact in favor of defendant are contrary to the manifest weight of the evidence. Accordingly, we think no good purpose will be served by an extended analysis or discussion of the evidence. Neither do we think it necessary to attempt to rationalize the motives which may have actuated the conduct of the respective parties in relation to the controversy. Suffice it to say that it is not within our province to say how we would have resolved these questions of fact were we sitting as trial judges.

Proceeding now to a determination of the first question of law posed above, it is our opinion that the language employed by the parties in defining the provisions relating to repairs by the lessee is not so uncertain or ambiguous as to require resort to rules of judicial construction. This being true, it was the function of the trial court to give force and effect to the plain terms and conditions of the contract freely entered into by the parties.

This brings us to a consideration of the provisions of the agreement relating to the repair and improvement of the leased premises. By its terms the lessor agreed:

(1) To put passenger and freight elevators in good working condition in compliance with ordinances and laws of the state.

(2) To make the repairs specified in exhibit A.

(3) To commence repairs within 15 days after receipt of written demand.

(4) To complete repairs within 60 days after demand.

(5) That if repairs are not begun within 15 days, lessee may make such repairs and deduct the cost thereof from the rentals payable under the lease.

(6) If the repairs are commenced by lessor and not finished within the period specified, lessee may like-

wise complete the same and deduct the cost thereof from the rentals payable.

(7) That all such rentals shall be abated for the period that such repairs shall remain uncompleted after the expiration of 60 days after receipt of such written demand.

It is very important to note from this analysis of the obligations of the lessor that *if it undertook* to make the repairs and improvements, there was *an obligation imposed upon it to do so within a period of 60 days*, but, upon failure of lessor to fulfill the terms of its agreement in this respect if lessee undertook to make them, *a corresponding obligation was not placed upon lessee to do so within 60 days.* Thus it is difficult to understand why the trial court in its conclusions of law so held because thereby it injected an issue which neither of the parties had raised in the pleadings, evidence, or briefs. Reading into the agreement such a limitation of lessee's rights is wholly unwarranted by the context. Under the issues made by the pleadings, there could logically be no reason for a compromise finding or judgment.

Under the issues made by the pleadings, and, on this appeal, the plaintiff is entitled either to a recovery of the full amount sued for, or, none at all. Conversely, the defendant is entitled either to a full setoff against the accrued rentals, or none at all. The issues made by the parties are as clear-cut and simple as that. There could be many good reasons why a limitation as to time of completion was not imposed by the agreement upon lessee, one of which is, that by the terms of the contract, the primary obligation was assumed by the lessor to make the repairs or improvements to its own building. It was only in the event of default of this primary obligation by lessor that lessee was given the right to proceed, in which case, so far as its obligations were concerned, it could do so without restriction

as to time, so long as it deducted only the cost of repairs from the accrued rentals. It is the law under such circumstances as are here shown, where no specific amount was agreed upon, that the repairs and improvements should be made at a reasonable cost. But no issue was made in the pleadings or by the evidence that the sum of $17,428.50 expended by defendant for cost of repairs was unreasonable. In other words, there was no denial of the cost of the repairs, but denial only of the right to charge the cost thereof against the rentals. These repairs were in the nature of permanent improvements which certainly enhanced the value of the property, although the same was sold by plaintiff before the expiration of the lease. Furthermore, the assertion that repairs and improvements were not made as expeditiously as possible in relation to the abatement of rent during such period of construction and repair becomes inconsequential in view of the fact that the sum total of the unpaid rent is less than the cost of the repairs made. We, therefore, conclude that the time element relating to lessee's right to make repairs under the circumstances here shown is without material significance. The *cost of the repairs was the important and controlling factor,* inasmuch as the cost *thereof was by agreement to be deducted from the rentals.* But, regardless of these considerations, the plain terms of the contract must govern and the court is without power to read into the contract an intention that the parties themselves did not express therein. If it is contended that so far as the plaintiff is concerned, the contract was an improvident one because no time limit was placed upon the defendant within which the repairs should be commenced or completed, the answer is obvious.

It is fundamental that courts may not extend their jurisdiction and powers to construe plain and unam-

biguous language to relieve parties competent to contract from hardship, and courts may not relieve them from an improvident agreement in the absence of fraud or bad faith. This proposition was succinctly declared by our Supreme Court in *Ullmann* v. *May*, 147 Ohio St., 468, 72 N. E. (2d), 63, the first and second paragraphs of the syllabus of which are as follows:

"1. Where a written agreement is plain and unambiguous it does not become ambiguous by reason of the fact that in its operation it will work a hardship on one of the parties thereto and corresponding advantage to the other. (*Ohio Crane Co.* v. *Hicks*, 110 Ohio St., 168, approved and followed.)

"2. Courts do not relieve a party competent to contract from an improvident agreement in the absence of fraud or bad faith."

See, also, the following quotation from 12 American Jurisprudence, 749, Contracts, Section 228, and supporting cases thereunder, cited at page 749 *et seq.*:

"Interpretation of an agreement does not include its modification or the creation of a new or different one. A court is not at liberty to revise an agreement while professing to construe it. Nor does it have the right to make a contract for the parties—that is, a contract different from that actually entered into by them. Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no

right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made.

"There is no right to interpret the agreement as meaning something different from what the parties intended as expressed by the language they saw fit to employ."

See, also, 9 Ohio Jurisprudence, 397, Contracts, Section 173, and supporting cases therein cited at page 397 *et seq.*, as follows:

"Where the meaning of a contract is clear upon its face, there is said to be no need, nor right, of construction. It has been stated that 'the first general maxim of interpretation is that it is not allowable to interpret what has no need of interpretation. When a writing is worded in clear and precise terms, when its meaning is evident and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which it naturally presents.'"

Proceeding to the second question presented, it is our conclusion that the trial court erred in attempting to construe the contract which, on its face, is plain and unambiguous, because thereby an unwarranted legal issue was erroneously injected which had not been made an issue by the pleadings or evidence. The disputed issues of fact having been determined favorably to the defendant, there remains only a question of law, namely, a proper application of the terms of the agreement relating to repairs by the lessee. On this basis, the defendant is entitled under the facts as found by the trial court and the provisions of the lease contract to full credit for the cost of repairs, which, being in excess of the accrued rentals, creates a complete setoff in favor of defendant on its cross-petition against the rentals claimed by plaintiff in its petition.

For these reasons, the judgment of the Common Pleas Court is reversed as contrary to law, and, pro-

ceeding to enter the judgment which should have been rendered by the Court of Common Pleas, final judgment is rendered for defendant.

*Judgment reversed.*

KOVACHY, J., concurs.

SKEEL, J., dissents. I dissent from the conclusions of the majority as to the interpretation of the repair provision of the lease and the rights and obligations of the parties thereunder.

The evidence, most of it documentary, shows that the defendant occupied the premises from the dates of the several leases, using the first floor as a retail storeroom for its meat and merchandising business, and the basement and second and third floors for storage purposes.

In July 1946 defendant asked for an extension of the lease, stating that it contemplated making extensive alterations which would not be justified with the five years remaining under the lease. Nothing was said about repairs in this request. In August, the request for extension was refused. Whereupon, on August 13, 1946, defendant, through its counsel, in a letter concerned primarily with securing a substantial extension of time of occupancy, referred to the repair provision, calling attention to the specific paragraph in the lease providing for repairs and then saying: "When you have examined this we shall be glad to hear further from you as to your disposition if formal demand were made for the making of these repairs."

Thereafter, defendant, on August 29, 1946, gave written notice that the repairs to the second and third floors called for by the lease as exemplified by an architect's drawing attached to the lease and designated as exhibit "A" should be made at once.

On August 30, the plaintiff addressed a letter to the defendant saying they had sent workmen to start the work, but the defendant refused to permit them to begin. On September 13, 1946, the plaintiff informed the defendant that the repairs called for by the lease would require government approval under the United States Civilian Production Administration. After an application was made for leave to do the work and some negotiations had, the Civilian Production Administration refused to allocate materials necessary for these repairs as shown by their letter to the plaintiff dated October 16, 1946.

It was, however, indicated by Civilian Production Administration that some part of the work might be done, but the defendant by letter dated February 7, 1947, said that such limited repairs would not be of any value to the defendant. There is considerable correspondence in the record between October 1946 and February 1947 wherein the defendant continued its demand that the repairs be done, or it would proceed to do them under authority of the lease. On February 27, 1947, the Regional Compliance Director of Civilian Production Administration wrote a letter directly to the defendant in which the defendant was notified in part as follows:

"Accordingly it is our responsibility to caution you that the beginning or carrying on of such activity unless authorized will be construed as a violation of the order."

The Civilian Production Authority's control of the use of building materials for construction and repair work of this kind came to an end on June 27, 1947. However, by this time negotiations had been commenced for the purchase of the building by the defendant. These negotiations continued until August 11, 1948, when the defendant notified the plaintiff that the defendant would not purchase the building because a

lease "By Neisner Bros. creates too many problems to make a purchase by my clients practical." This letter continues: "However, as you know, the lease on the premises to our clients extends to 1950. They would like at this time to consider the possibility of extending their lease if your clients would give this matter their consideration."

During the entire period of negotiations to purchase the property over a period of about a year and a half, not a thing was said about the repairs until after the defendant's letter of August 11, 1948, above quoted in part. Thereafter, on October 30, 1948, the defendant notified the plaintiff by registered mail to begin the repairs. The plaintiff refused to proceed on the ground that the defendant had by its conduct waived the right to enforce the repair provisions of the lease.

On November 20, 1948, the defendant notified the plaintiff that more than 15 days had elapsed since its letter of October 30, 1948, and that the defendant would therefore proceed with the work and charge the cost against the rent thereafter accruing. The defendant then entered into a contract with J. H. Dickson Company to make the repairs which the defendant claimed were to be made, upon notice, under the lease. The contract was dated December 15, 1948, when there was but one year and nine months left for the defendant to occupy the property under the lease.

The contract limited the contractor from doing more than $1,800 worth of work, including cost of materials, in any one month or from issuing purchase orders for materials for more than $600 at one time without the consent of the defendant, the contract being subject to cancellation upon five days notice and the work to be suspended on one day's notice. The work was to be done on the second and third floors separately, that is, the second floor was to be repaired as outlined in 16 items set forth in the contract, each item to be done

in the order set forth in the contract, and, when finished, the same order was to follow in doing the work on the third floor. The contract was made without any regard to economy in accomplishing the repairs or the benefits the defendant would be expected to derive in the greater enjoyment of the use of the premises when improved. In fact, at the rate the work was being done the repairs would, in all probability, not have been completely finished within the remaining time of defendant's occupancy. It is reasonable to conclude that defendant did not expect to enjoy any benefit from the repairs, but that they were being done in this manner to compel plaintiff to extend defendant's lease.

After the negotiations for the sale of the property between the parties was terminated without success, plaintiff entered into an agreement to sell the property to Bryden Michigan Building Company, the sale being concluded October 20, 1949. Defendant was notified to pay rent from that date to the new owner and demand was made for the unpaid rent from December 7. 1948, to the date of the sale. On October 20, 1949, the total of rent unpaid was $16,275.92. During the same period of time the defendant claims to have expended $17,428.50 for repairs.

The trial court in stating its conclusions of fact and law held that the repairs contemplated to be done under the lease were such as could have been accomplished in 60 days. An officer of the contractor employed by defendant testified that if no restrictions had been placed on the contractor, the work that was done could have been done in 90 days at the most. Therefore, the court held that, under the lease, the defendant was entitled to a credit of two-thirds of the funds expended for repairs. The court determined this amount to be $11,619.02, which when deducted from the rent due and unpaid with interest due on the rent,

entitled plaintiff to a judgment in the total sum of $5,541.69.

I concur with the majority that the trial court was in error in finding that the lease, in the paragraph dealing with the subject of repairs, provided that defendant was entitled to be repaid only for such of the repairs required to be made upon notification by the lessee were those that could be reasonably completed in 60 days. Exhibit "A," attached to the lease and incorporated within its terms by reference, designated the repairs that were to be made if and when requested by the lessee. The promise of the lessor was that the repairs as designated would be made within 60 days from the date of notice, and work was to begin within 15 days after notice so that if the lessor did not begin the work until the 15th day after notice, only 45 days would remain within which to do the work as contemplated by the agreement. But there can be no doubt that the repairs to be made were those specified in exhibit "A." Failure to complete such repairs within the time specified gave the defendant certain other rights, but there is no doubt as to what repairs were to be made. The court was, therefore, clearly in error in its conclusion.

Four distinct obligations are provided for by the repair provisions of the lease:

1. The repairs to be made when requested by lessee were set out in exhibit "A."

2. If the lessee wanted the repairs made it was to give notice of such demand whereupon the plaintiff had 15 days within which to start the work, it being also provided that the repairs were to be completed 60 days from date of the notice.

3. If the lessor failed to start the work within 15 days or complete it within 60 days from the date of the notice, the lessee could step in and make or complete such repairs.

34

4. From the time the lessee took over upon lessor's default until the work was done, the rent was to be abated and whatever cost was expended by lessee in making the repairs was to be deducted from rents thereafter payable under the lease. There was to be no personal liability on the part of the lessor for such expenditures by the lessee.

It is clear from the foregoing that the parties were providing for a means by which the lessee could, at its request, require the repair of the property to enhance its usefulness for the defendant's benefit.

The repairs were not to be made as a means of preserving or benefitting the property. The lessee's interest was the sole purpose of this provision of the lease.

It must also be observed that time was of the essence in the performance of the repair provisions. The work was to be completed in 60 days from the date of notice and failure on the part of the lessor to start or finish the work in the agreed time gave the lessee the right to step in and do the work so that it would be promptly done. The lease also provided that from the end of the 60-day period after notice until the work was completed, the rent was to be abated. These provisions show clearly that time was of the essence in making the repairs. It should also be noted that the lessor did not promise to be indebted to and pay the lessee for the money expended by it in case of lessor's default in its promise to make repairs and the lessee should make them as provided by the lease. The provisions of the lease were to the effect that whatever money the lessee expended in making the repairs or to complete them because of lessor's breach was to be deducted from the rentals payable under the lease, so that if the rent was abated until the work was done, there would be no funds out of which the lessee could be paid for its work until the repairs were completed. It is a natural infer-

ence from these provisions that it was the intention and understanding of the parties that the work should be promptly done.

The record gives support to the plaintiff's claim that defendant acted in bad faith in demanding the repairs and in making them upon the claimed default of the lessor when and in the manner in which they were made. It is claimed that the defendant's sole purpose was to try to force the lessor to grant an extension of the lease. Bad faith, however, even if shown in demanding performance of a promise made in a contract is no defense to liability for breach of such promise. The lessor agreed to make the repairs and admittedly refused to do so claiming the right so to do. Whether or not the defendant acted in bad faith and, by this and other conduct, waived the right to the repair provision of the lease, is a question of fact which the court resolved against the plaintiff. It is my conclusion that such holding was against the manifest weight of the evidence.

The question remains as to whether the defendant's conduct in making the repairs comes within the authority of the lease. The contract for repairs was made by the defendant so that by its terms the work would be dragged out over a long period of time, many months beyond which would be reasonably necessary to do the work under all the surrounding circumstances. An examination of the defendant's contract with the construction company showed a studied purpose to expend an amount each month for repairs equal to the rent without giving consideration to the fact that such dilatory process was unduly extending the time in which the rent was abated and also depriving the defendant of any benefit resulting to it from the repairs if and when finished. Not only was the rent abated until the repairs were completed, but thereafter the cost could be deducted from rent then coming due.

If the defendant desired to make the repairs, as he had a right to do upon default by plaintiff, it was his duty to proceed with due diligence, looking to a completion of the work at the earliest reasonable date. This, the defendant did not do.

The plaintiff, however, was in default and the defendant did start the work as it had the right to do, so that the plaintiff's right to rent during the period for which this action is brought must be reduced by the abatement clause for the time within which the defendant could have, in the exercise of due diligence, completed the work that was done within the provisions of exhibit "A."

The defendant's answer claims no right against the plaintiff for the money expended for repairs or that there was any rent money due against which the cost of repairs could be set off. The answer provides:

"'* * * that because of the plaintiff's failure to commence said repairs within said period, defendant on or about the first day of December, 1948, commenced the repairs specified in ex. 'A' attached to the aforesaid lease; that the defendant continued said repairs from said time through October 20, 1949 and paid the cost of said repairs to the extent of eight hundred and eighty dollars ($880) for each of the months for the period commencing December 8, 1948 and through October 20, 1949.

"Defendant further says that by reason of the provisions of the aforesaid lease of May 28, 1937, the rental to plaintiff was by the agreement of the plaintiff abated during the period commencing December 8, 1948 through October 20, 1949 and that by reason thereof, defendant has been fully discharged of its obligation to pay any amounts to plaintiff under the aforesaid lease of April 15, 1935, from December 8, 1948 through October 20, 1949."

The same allegation is found in the answer to the

second cause of action as to the abatement of the rent under the lease of May 28, 1937.

It is to be seen therefore that the defendant's defense is based entirely on the right to abate the rent until the repairs were finished. No claim is made, or could be, that the amount expended should be set off against the rent as it accrued during the time the work was in progress, because the defendant's pleading alleged that during the period under consideration, all rent was abated.

The majority opinion expresses the view that there is no ambiguity in the repair provision of the lease which in part provides that the lessor "* * * will commence said repairs within fifteen days after receipt from the lessee of written demand so to do and will complete said repairs within sixty (60) days after receipt of such written demand, and further agrees that if said repairs are not begun within such fifteen day period, lessee may make such repairs, or, if commenced and not finished within the period hereinbefore specified, may complete the same and deduct the cost thereof from the rentals payable hereunder and under the other leases hereinbefore mentioned, *and the lessor further agrees that all such rentals shall be abated for the period that such repairs shall remain incompleted after the expiration of sixty (60) days after receipt of said written demand,*" followed by certain exceptions, here not important. The question must be stated as follows. Having undertaken to make repairs, can the lessor drag them out over a long period of time, thus abating the rent for longer than would be necessary in the exercise of due diligence through such dilatory tactics? Certainly such an interpretation of the above-quoted repair provision would bring about a result that could not have been contemplated by the parties when the lease was executed.

The lessee, having undertaken the repairs, owed the

duty to proceed with them or such of the repairs as were wanted within the repair provision with due dispatch and in as economic a manner as would be reasonably possible. The defendant owed the duty not to cause the rent to be abated longer than was reasonably necessary. This the defendant did not do as is evidenced both by the allegations of the answer where an abatement of rent is claimed for 11 months (the defendant's own witness testified the work that was done could have been done at the most in three months) and the terms of the contract between the defendant and its contractor employed to make the repairs.

The manner in which the defendant proceeded with the work was not in compliance with the repair provision of the lease. It is evident, however, that the defendant did start the repairs as it was its right to do so that the rent was abated for the period of time beginning 60 days after notice to the plaintiff until sufficient time had elapsed from the date of notice to, in the exercise of reasonable diligence, complete the work agreed upon or so much of the work as defendant desired. The amount of the rent thus abated must be credited against the total amount due. It must also follow that the reasonable cost of whatever work was done within that period during which the rent was rightfully abated must be deducted from the rent accruing after such period had come to an end.

One other question seems clearly presented by the pleadings and that is the question of whether the defendant's dilatory contract for making the repairs, seeking as it did only to cancel the rent as it came due, does not require an entirely different measure of damages because of the plaintiff's breach than was applied by the court or is suggested by the foregoing opinion.

As heretofore stated, the repairs called for by the lease were to be, if made, for the benefit of the lessee. It must be presumed that when made the lessee would

have a more profitable use of the property. Whether they were made depended entirely upon the lessee. If no request was served on the lessor there was no duty on plaintiff's part to make them.

It would be a reasonable deduction in considering the defendant's contract with the J. H. Dickson Company, that the defendant did not intend to derive any benefit from the repairs being made in the dilatory fashion provided by that agreement and that the sole purpose of compelling the work to be done was to force an extension of the lease. Delaying the request for repairs until almost the very end of the lease and then contracting for the making of the repairs in such a way as to destroy any possibility of benefiting the defendant, and at the same time compelling the plaintiff to expend a large sum of rent money for repairs which it may prefer not to have made at the very end of the lease, puts a heavy burden on the plaintiff with no benefit whatever to the defendant. Under such circumstances, if the facts are found to be as just stated, the defendant would owe the duty of mitigating the damages.

Williston, in his work on *Sales* (Vol. 3 [Rev. Ed.], 265, Section 588), states the rule as follows:

"If the plaintiff by taking one line of conduct may secure such advantage as the contract entitles him to at less expense to the defendant than if another course is pursued, the plaintiff should be allowed only damages based on the former course."

On the evidence, as disclosed by the bill of exceptions, the question of the rule of damages to be applied to the plaintiff's default should have been given consideration by the trial court.

For the foregoing reasons, the judgment should be reversed and the cause remanded for further proceedings according to law.